J-S08034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TERRANCE STOCKTON | : | |
| | : | |
| Appellant | : | No. 2980 EDA 2017 |

Appeal from the Judgment of Sentence April 28, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011921-2015

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED MARCH 07, 2019**

Appellant, Terrance Stockton, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction at a non-jury trial on the charges of possession of a firearm prohibited, carrying a firearm without a license, and possession of an instrument of crime.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows:  Following his arrest, Appellant, who was represented by counsel, proceeded to a bench trial. At the bench trial, Robert Charles Lammers testified that, on April 9, 2015, at approximately 4:10 p.m., he was at Smith's Playground at 24th and Jackson Streets exercising his dog when he observed a gray Ford Taurus following a

---

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 907(a), respectively.

---

*   Former Justice specially assigned to the Superior Court.

dark blue Chevrolet Suburban on 24th Street.  N.T., 1/31/17, at 8-9.  The driver of the gray Taurus was honking the horn of the vehicle, and in Mr. Lammers' opinion, was trying to get the Suburban driver's attention.  *Id.* at 9.  Mr. Lammers observed as the Suburban turned onto Wolf Street with the Taurus following it.  *Id.* at 12.  When the Suburban stopped at a stop sign, the Taurus pulled alongside the driver's side of the Suburban.  *Id.*  The vehicles were alongside each other for "maybe 5 to 10 seconds," and then Mr. Lammers heard "a bunch of gunfire, maybe 6 to 8 gunshots."  *Id.* at 14.  Mr. Lammers testified that it was obvious the gunfire was coming from occupants of one or both vehicles, but he could not tell "who was shooting at who."  *Id.* He clarified that "it sounded like there were two guns being fired because of the fastness and rapidness of the fire[.]"  *Id.* at 14-15.

After the gunfire ceased, Mr. Lammers observed as the Suburban turned to the right and the Taurus turned to the left.  *Id.* at 15.  Within five minutes, Mr. Lammers was able to flag down a police officer to report what he had just witnessed.  *Id.*  Subsequently, the police took Mr. Lammers to 39th Street and Woodland Avenue, where the police had discovered the gray Taurus.  *Id.*  Mr. Lammers positively identified the vehicle as the one that had been following the Suburban.  *Id.*

Philadelphia Police Officer Rafael Nieves-Smart testified that he was on routine patrol driving south on 24th Street approaching Wolf Street when Mr. Lammers, who was frantically waving his arms, ran towards his patrol car.

N.T., 2/8/17, at 4. Mr. Lammers advised the officer that, thirty seconds prior thereto, occupants of a dark blue Chevrolet Suburban and a gray Ford Taurus had engaged in a shootout with each other. *Id.* at 5. Officer Nieves-Smart immediately put flash information out over the police radio as to the two vehicles, and he confirmed that, eight minutes later, he received instructions to transport Mr. Lammers to 39th Street and Woodland Avenue. *Id.* at 6, 9. He testified that a gray Ford Taurus was at the location, and Mr. Lammers positively identified the vehicle as being involved in the earlier gun battle. *Id.* at 7. Officer Nieves-Smart noted that the vehicle had bullet holes down the passenger's side. *Id.* at 8.

University of Pennsylvania Police Officer Paul Frosch testified that he was on duty when he received information that a male, who had been riding in a Ford Taurus with a certain license plate number, had been dropped off at the hospital with a gunshot wound. *Id.* at 22. Officer Frosch began looking for the vehicle, and soon located it at 39th Street and Woodland Avenue. *Id.* at 22-23. Officer Frosch activated his cruiser's lights and stopped the Ford Taurus. *Id.* at 24.

Officer Frosch testified that Edward Dolison was driving the Ford Taurus and, upon searching the vehicle, officers discovered a firearm in the center console. *Id.* at 25. He also noted that a spent fired shell casing was slightly stuck to the right windshield wiper and the vehicle's passenger side had two or three bullet holes. *Id.* at 26-27. Officer Frosch testified that, at this time,

- 3 -

officers did not remove the firearm or the shell casing but left the items intact for later processing. *Id.* Officer Frosch transported Mr. Dolison to the police station. *Id.*

Philadelphia Police Detective Tim Quinn testified that the shooting occurred near police headquarters and he heard "loud noises." *Id.* at 37. He heard the radio broadcast of "shots fired," and he went to the park to talk to Mr. Lammers. *Id.* at 37-38. While talking to Mr. Lammers, Detective Quinn received a radio call that a gunshot victim had been dropped off at the Hospital of the University of Pennsylvania, which was three miles from the scene of the shooting, at approximately 4:18 p.m. *Id.* at 38-39. Accordingly, Detective Quinn proceeded to the hospital. *Id.* at 40.

Upon arrival, Detective Quinn discovered Appellant in the emergency room with a gunshot wound to his right chest. *Id.* Detective Quinn testified that he then received a radio call indicating the Ford Taurus had been located, so he left the hospital with Appellant's clothes, which had been bagged by hospital personnel, and proceeded to examine the Ford Taurus. *Id.* at 41.

Detective Quinn testified he took photographs of the Ford Taurus, including the bullet holes, and removed the spent shell casing from the passenger's side windshield wiper. *Id.* at 41-47. The Ford Taurus was towed to the police garage, where the gun was ultimately removed from the center console. *Id.* Detective Quinn testified the gun was a Smith and Wesson SW9F, which was loaded with four chrome Spear bullets and three gold FC .9

millimeter bullets.  *Id.* at 44-45, 48.  The spent shell casing, which was removed from the right windshield wiper, was a .9 millimeter Spear cartridge (the same as the four chrome Spear bullets inside the gun).  *Id.*  Further, Detective Quinn placed Appellant's clothing on a property receipt and submitted the clothing for gunshot residue testing.  *Id.* at 42.

Detective Quinn testified that he recovered from the hospital a video recording, which depicted the gray Ford Taurus pulling up to the hospital's bay area.  *Id.* at 56.  The video showed a driver getting out of the vehicle, running into the hospital, and returning with hospital personnel.  *Id.*  Further, the video revealed that, as soon as hospital personnel removed the passenger from the vehicle and placed him on a gurney, the driver sped away in the vehicle.  *Id.* at 57.

Hun Lee, a forensics specialist employed by the Philadelphia Police Department, testified that he has been trained to perform gunshot residue testing and he examined Appellant's clothing, which had been seized by Detective Quinn.  *Id.* at 79.  Specifically, he examined a hooded sweatshirt, a pair of blue jeans, a belt, a short-sleeved shirt, underwear, a tank top, a pair of socks, and a pair of boots.  *Id.* at 80.  Upon testing, the hooded sweatshirt tested positive for gunshot residue, a majority of which was on the front and back of the right sleeve and cuff of the sweatshirt, with lesser amounts as one went right to left across the sweatshirt.  *Id.* at 84.

Mr. Lee testified that his testing detected 59 separate gunshot residue particles on the sweatshirt, and he opined that this is a "large number" consistent with the conclusion that the person who was wearing the sweatshirt fired a weapon. *Id.* at 83-84. He added that he could not rule out other scenarios, including the fact the person wearing the sweatshirt may have been a victim who was standing within three feet of a discharging firearm. *Id.* at 85. Mr. Lee offered his opinions to a reasonable degree of scientific certainty. *Id.* at 86.

Philadelphia Police Officer Robert Stott, who testified as an expert in firearms identification and analysis, indicated that the gun, which was seized from the Ford Taurus, was operable. *Id.* at 93-94. He opined that the spent fired shell casing, which had been seized from the Ford Taurus' windshield wiper, had been fired from the gun. *Id.* at 94-97. He noted that the shell casing stuck to the windshield wiper because "at the time of fire a cartridge casing is very hot." *Id.* at 98. He noted that, if the driver of the Ford Taurus, as opposed to a passenger of the Ford Taurus, had fired the gun, it would have been more likely that the gunshot residue would be on the exterior of the car, as opposed to the passenger's sweatshirt. *Id.* at 98-99.

In addition to the foregoing evidence, the parties stipulated that no fingerprints could be lifted from the gun. *Id.* at 103. DNA samples from the gun, and testing thereof, excluded Mr. Dolison but the results as to Appellant were, in part, "negative" and, in part, "inconclusive." *Id.* at 103-04. Further,

the parties stipulated that Appellant did not have a valid license to carry a firearm and was ineligible to possess a firearm due to a previous conviction. *Id.* at 107.

At the conclusion of the trial, the trial court found Appellant guilty of the foregoing charges, and on April 28, 2017, Appellant proceeded to a sentencing hearing at which Appellant received an aggregate of six years to twelve years in prison, to be followed by ten years of probation. Appellant filed a timely, counseled post-sentence motion in which he raised, *inter alia*, a weight of the evidence claim. The post-sentence motion was denied by operation of law on August 30, 2017, and this timely appeal followed.[2]

On appeal, Appellant presents the following issues (verbatim):

I.  Was the evidence was [*sic*] sufficient to sustain the verdicts in view of the fact that each incriminating inference also included an exculpatory inference which left the fact finder with a guess as to which to apply?

II.  Were the verdicts against the weight of the evidence because each incriminating inference also allowed an exculpatory inference which only allowed the fact finder to guess at which to apply and such procedures shock the conscience?

Appellant's Brief at 9.

_____

[2] Counsel initially failed to file a court-ordered Pa.R.A.P. 1925(b) statement; however, counsel filed a petition in this Court seeking permission to file a statement *nunc pro tunc*. This Court granted relief, and Appellant filed a Rule 1925(b) statement, to which the trial court filed a responsive Rule 1925(a) opinion on February 13, 2018.

In his first issue, Appellant contends the evidence was insufficient to sustain his three firearms convictions. Specifically, Appellant avers the Commonwealth failed to prove beyond a reasonable doubt that Appellant possessed a firearm since the evidence was contradictory as to whether he actually fired it. In this vein, Appellant contends that, particularly as it relates to the gunshot residue test results, the trial court made improper inferences of guilt where the evidence equally provided inferences of innocence.

Preliminarily, we note:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.
>
> Further, in viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the court must give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

**Commonwealth v. Harden**, 103 A.3d 107, 111 (Pa.Super. 2014) (quotation marks and quotations omitted).

Initially, we agree with Appellant that possession is an element of the firearms offenses,[3] and the firearm was not discovered on Appellant's person so as to establish actual possession. *See Commonwealth v. Macolino*, 503 Pa. 201, 469 A.2d 132, 134 (1983) (holding that actual possession is shown by proving the contraband was found on the defendant's person). However, to the extent Appellant suggests the Commonwealth was required to prove

---

[3] 18 Pa.C.S.A. § 6105 provides, in relevant part, the following:
**§ 6105. Persons not to possess, use, manufacture, control, sell or transfer firearms**
**(a) Offense defined.--**
    (1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.
18 Pa.C.S.A. § 6105(a)(1).
    18 Pa.C.S.A. § 6106 provides, in relevant part, the following:
**§ 6106. Firearms not to be carried without a license**
**(a) Offense defined.-**
    (1) [A]ny person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.
18 Pa.C.S.A. § 6106(a)(1).
    18 Pa.C.S.A. § 907 provides, in relevant part, the following:
**§ 907. Possessing instruments of crime**
**(a) Criminal instruments generally.--**A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.
18 Pa.C.S.A. § 907(a)(1).

that Appellant actually possessed the firearm (*i.e.*, fired it), we disagree. Rather, to establish the element of possession, this Court has held that "[p]ossession can be found by proving actual possession, constructive possession, or joint constructive possession." ***Commonwealth v. Parrish***, 191 A.3d 31, 36 (Pa.Super. 2018) (citation omitted).

We have previously determined:

> Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction. Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. We have defined constructive possession as conscious dominion, meaning that the defendant has the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.
>
> It is well established that, as with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue.

***Parrish***, 191 A.3d at 36–37 (internal citations and quotations omitted).

To find constructive possession, the power and intent to control the contraband does not need to be exclusive to the appellant. Our Supreme Court has recognized that "constructive possession may be found in one or more actors where the item in issue is in an area of joint control and equal access." ***Commonwealth v. Johnson***, 611 Pa. 381, 26 A.3d 1078, 1094 (2011) (internal citation omitted).

Here, viewing the evidence in the light most favorable to the Commonwealth, as the verdict winner, we agree with the trial court that the evidence sufficiently establishes Appellant's joint constructive possession of the firearm, which was seized from the center console of the Ford Taurus. As the trial court noted, in developing his claim that the evidence was insufficient, Appellant focused on the gunshot residue test results and Mr. Lee's opinions in connection therewith. *See* Trial Court Opinion, filed 2/13/18, at 8. However, the trial court's verdict was based on the gunshot residue test results, as well as other evidence, which Appellant completely ignores in his sufficiency argument. *See id.*

For instance, Mr. Lammers testified that he observed as the driver of a gray Ford Taurus honked the vehicle's horn in an apparent attempt to get the attention of the occupant or occupants of a dark blue Chevrolet Suburban. He then watched as the Suburban stopped at a stop sign and the Taurus pulled up alongside the driver's side of the Suburban. Within five to ten seconds, Mr. Lammers heard a gun fight between occupants of the two vehicles and he specifically indicated "it sounded like there were two guns being fired because of the fastness and rapidness of the fire[.]" N.T., 1/31/17, at 14-15. According to Officer Nieves-Smart, Mr. Lammers frantically waved down his patrol car, reporting that, just thirty seconds prior thereto, occupants of a gray Ford Taurus and dark blue Chevrolet Suburban had engaged in a shootout with each other. N.T., 2/8/17, at 5.

Further, video footage from the Hospital of the University of Pennsylvania, which was located just three miles from the shootout, revealed Appellant was removed from a gray Ford Taurus with a certain license plate number approximately eight minutes after the shootout. The video footage also showed the driver of the Ford Taurus speeding away as soon as Appellant was removed from the vehicle. Appellant had sustained a gunshot wound to his right chest.

University Police Officer Frosch testified he received information about Appellant being dropped off at the hospital, as well as a description of the vehicle, and effectuated a stop of the Ford Taurus soon thereafter. Officer Nieves-Smart testified that, eight minutes after Mr. Lammers approached him, he was directed to take Mr. Lammers to 39th Street and Woodland Avenue to view the Ford Taurus. Mr. Lammers positively identified the Ford Taurus as the same vehicle he had seen earlier. The police observed bullet holes on the passenger side of the Ford Taurus, as well as a spent fired shell casing stuck to the passenger side windshield wiper. The firearm was discovered in the center console. Also, subsequent fingerprint analysis of the firearm was, in part, "inconclusive" as to Appellant. There is no dispute that Appellant had a large amount of gunshot residue particles on his sweatshirt, which he was wearing when he arrived at the hospital; however, Mr. Lee could not state with certainty whether Appellant fired the gun, which produced the gunshot residue.

We agree with the trial court that, when viewed in its totality, the circumstantial evidence reveals that Appellant and the driver of the Ford Taurus had the power and intent to control the firearm. *See Johnson*, *supra*. Simply put, contrary to Appellant's assertion, the Commonwealth was not required to demonstrate that he actually fired the gun in order to establish Appellant's possession thereof. Further, contrary to Appellant's assertion, the Commonwealth was permitted to establish Appellant's constructive possession via circumstantial evidence and the reasonable inferences that arise therefrom. *Parrish*, *supra*. Accordingly, we conclude Appellant is not entitled to relief on his first claim.

In his final issue, Appellant contends the trial court's verdict was against the weight of the evidence such that he is entitled to a new trial.[4] Specifically, Appellant avers that, in finding Appellant possessed the firearm, the trial court relied upon "guess work." Appellant's Brief at 11. His argument is premised upon the fact Mr. Lee offered several theories as to how the large amount of gunshot residue landed on Appellant's sweatshirt.

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*,

---

[4] Appellant adequately preserved his weight claim in his post-sentence motion. *See* Pa.R.Crim.P. 607(a).

129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. **Commonwealth v. Hopkins**, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. **Talbert**, **supra**.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. **See id.**

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Id.** at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." **Id.** (quotation marks and quotation omitted).

Here, in rejecting Appellant's weight claim, the trial court indicated that it found "[t]he Commonwealth presented credible testimony that [A]ppellant possessed a firearm." Trial Court Opinion, filed 2/13/18, at 11. Further, the trial court indicated:

- 14 -

As noted [*supra*], the factors underlying that conclusion were, *inter alia*, the large amount of gunshot residue on the front of his sweatshirt, the fact that he was shot in the chest during a gunfight while sitting in the passenger seat of the [Taurus], [] the discovery of and location where the spent shell casing was found, [and the location of the gun in the center console]. These factors caused the [lower] court to conclude that the verdict did not shock the conscience and it is respectfully submitted that said finding did not amount to an abuse of discretion.

***Id.***

On appeal, Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, a task that is beyond our scope of review. The trial judge, as finder of fact, had the duty to determine the credibility of the testimony and evidence presented at trial. ***See Commonwealth v. Collins***, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). We agree with the trial court's analysis and conclude Appellant is not entitled to relief on his weight of the evidence claim. ***See Talbert***, ***supra***.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/7/19

- 15 -